******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE LILYANA P.*
(AC 39348)

Lavine, Alvord and Schaller, Js.

*Argued November 14—officially released December 9, 2016***

(Appeal from Superior Court, judicial district of
Middlesex, Child Protection Session at Middletown,
Olear, J.)

*David J. Reich*, for the appellant (respondent

mother).

*Daniel M. Salton*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent mother, Laura F., appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights with respect to her daughter, Lilyana P.[1] On appeal, the respondent claims that the court (1) improperly determined, in accordance with General Statutes § 17a-112 (j) (3) (B) (i), that the petitioner had proven by clear and convincing evidence that Lilyana previously was adjudicated neglected and that the respondent had failed to achieve a sufficient degree of personal rehabilitation to encourage a belief that she could assume a responsible position in Lilyana's life within a reasonable period of time, and (2) violated her substantive due process rights "because [she] was recovering from a disabling medical condition that had prevented her from rehabilitating as a parent." We affirm the judgment of the trial court.

The record reveals the following relevant facts, which are uncontested or were found by the trial court, and procedural history. The respondent, as a child, suffered from neglect, as well as physical and sexual abuse. Because of the abuse, the respondent was mentally unstable, which led to her three month hospitalization in the fall of 1995. At that time, when the respondent was nine years old, she was diagnosed with impulsive control disorder, mood disorder, obsessive compulsive traits, and attention deficit hyperactivity disorder.

The respondent graduated from high school, but her only reported employment occurred in 2008. She has never been married. In 2005, her first child was born, who is in the care of his paternal aunt and the aunt's mother as co-guardians. In 2008, her second child was born, and a transfer of guardianship to that child's maternal aunt and uncle was granted in 2010. The children have different biological fathers.

The respondent has a significant history of substance abuse. While she was together with the father of her second child, she and the father used cocaine. They spent between $40,000 and $50,000 on cocaine and alcohol, which depleted her grandmother's savings account and his trust fund. The respondent stopped using cocaine when she became pregnant with her second child in 2007.

In April, 2009, the respondent suffered multiple injuries in a serious automobile accident. While hospitalized, she was exposed to and became a carrier of Methicillin-resistant Staphylococcus Aureus (MRSA). She weighed more than 225 pounds when she was released from the hospital, and has had mobility issues as a result of her injuries and the loss of her calf muscle due to MRSA. Additionally, the respondent is prone to kidney infections, herniated discs, and migraine headaches.

In November, 2012, the respondent met Bryan P., the father of her third child, Lilyana. She became pregnant shortly after they met, and Lilyana was born in August, 2013. At the time of her birth, Lilyana had benzodiazepines and opiates in her system and was experiencing withdrawal symptoms. When the respondent indicated that she was going to remove Lilyana from the hospital against medical advice, a call was placed to the Department of Children and Families (department). Lilyana was released to her parents' care, however, after they agreed to cooperate with the department.

In April, 2014, the petitioner filed for an order of temporary custody because of ongoing concerns about the parents' substance abuse, their refusal to allow the department access to Lilyana, and their revocation of the releases they previously had signed allowing the department to communicate with service providers for them and Lilyana. Among the department's concerns, the respondent had visited various emergency rooms, which were not affiliated with her health care providers, seeking opiates. She also has a history of abusing prescription medications. On the scheduled date of the hearing on the petitioner's application, the parties reached an agreement, and Lilyana was returned to her parents. Specific steps were approved by the court on April 30, 2014, which included orders that the respondent was to have supervised contact only with Lilyana, and the parents were to enroll Lilyana in a child care facility at the department's expense.

In July, 2014, the respondent participated in a court-ordered psychological evaluation by Edward Rabe, M.D., Ph.D., who is an expert in child and adolescent psychiatry. Having missed her first scheduled appointment with Dr. Rabe, the respondent arrived an hour late for the second appointment. Her diagnosis at that time was mood disorder, post-traumatic stress disorder, and opiate abuse in remission. Dr. Rabe noted the respondent's history of substance abuse, including use of cocaine, and her intermittent use of opiates that had been prescribed during emergency room visits. He found her mental status evaluation to be "unremarkable, with the exception of her relative lack of insight and judgment related to her minimization of the significance of obtaining pain medications from prescribers who are not members of her treatment team, and her failure to recognize the consequences of withholding [department] access to her provider records." Dr. Rabe opined that the respondent's "problem list consists of psychiatric issues, substance abuse issues, and medical issues."

In his concluding remarks in the psychiatric evaluation, Dr. Rabe stated that the respondent currently was refraining from seeking and using supplementary opiates prescribed by clinicians who were not members of her treatment team, but that a risk of relapse was

likely in the absence of monitoring, due to her limited judgment and insight. Accordingly, Dr. Rabe made the following recommendation: "Improved pain management could help [the respondent] reduce her episodic drug seeking and use. Re-referral to a pain clinic that specializes in management of pain syndromes in medically complex patients would be helpful in developing a treatment plan that renders this behavior unnecessary. Her [primary care physician], mental health prescriber, and pain management team should be in communication to develop a comprehensive understanding of her needs. A written treatment contract shared by all caregivers and signed by [the respondent] would be critical to developing a successful treatment plan."

The department provided the respondent with information for her to self-refer to Bristol Hospital and the University of Connecticut for their pain management programs.[2] She failed to engage with either program. Further, during an unannounced visit, the department found the respondent alone with Lilyana despite the court order that her contact be supervised. Additionally, the parents failed to enroll Lilyana in a child care facility. In November, 2014, Lilyana was removed pursuant to a subsequent order of temporary custody and placed in foster care, where she has remained. Following Lilyana's removal, the respondent was hospitalized following a suicide attempt.

In February, 2015, the respondent's left leg was amputated, and, thereafter, she was discharged to Silver Springs Care Center (Silver Springs) for rehabilitation. She remained at Silver Springs for approximately six months and then moved into a handicapped accessible apartment that the Department of Mental Health and Addiction Services helped her to obtain. She continues to reside in that apartment, receiving in-home assistance with everyday living, and she supports herself with social security benefits that she collects due to her mental health and medical issues. Additionally, she receives cash assistance from the Department of Social Services in connection with its Supplemental Nutrition Assistance Program.

On May 29, 2015, the petitioner filed a petition to terminate the parental rights of Bryan P. and the respondent with respect to Lilyana. The termination of parental rights trial was held on April 6 and 11, 2016. Although the trial was scheduled to resume on April 12, 2016, the respondent, on that date, brought a backpack with drug paraphernalia into the courthouse. The state police were called, and she was issued an infraction for possession of drug paraphernalia. The trial then was continued to April 20, 2016, at which time it concluded. The respondent was represented by counsel during the trial, and she testified at trial. Several witnesses testified at trial, including Dr. Rabe, and multiple exhibits were

admitted into evidence in this fully contested case.

The court issued its memorandum of decision on May 16, 2016, in which it made the following determinations: (1) the respondent's testimony at trial that she had no knowledge that the drug paraphernalia was in the backpack when she entered the courthouse on April 12, 2016, was not credible; (2) the respondent has "a significant history of substance abuse"; (3) prior to her pregnancy in 2007, the respondent and the father of her second child used cocaine and spent between $40,000 and $50,000 on cocaine and alcohol; (4) the respondent is prone to kidney infections and herniated discs; (5) Dr. Rabe opined that the respondent suffered from medical conditions that need to be treated in conjunction with her psychiatric problems and that enhanced pain and dietary management could reduce her need to seek narcotics to manage her distress; (6) Dr. Rabe recommended that the respondent be re-referred to a pain clinic and credibly testified that the respondent likely would not improve unless she received such pain management treatment; (7) the respondent's "attendance and compliance with service providers is spotty"; (8) the respondent was "resistant to and did not see the need for therapy, and she attended appointments, at least until recently, only at the insistence of her primary care physician"; (9) the respondent's "need for mental health treatment is also evidenced by her suicide attempts"; (10) although the respondent was provided with information to self-refer to the University of Connecticut pain clinic, she made one telephone call, was told there was a waiting list, did not put her name on the waiting list, and never again contacted the pain clinic to enroll; (11) the respondent "has a history of abusing prescription medications"; (12) Lilyana was adjudicated neglected on April 30, 2014; (13) Lilyana has remained committed to the care of the petitioner since February 5, 2015; (14) as of the time of trial, Lilyana was almost thirty-three months old and, considering both removals on the orders for temporary custody, had been in the care of the petitioner for more than seventeen months; (15) the respondent has limited insight and judgment as to the potential gains she could make if she engaged in adequate treatment for her mental health issues and physical maladies; (16) the respondent has not attended a pain clinic and, therefore, "has not taken the step to address the interaction between her medical problems and her psychiatric and psychological problems"; (17) "[t]he failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation" [internal quotation marks omitted]; (18) the petitioner proved by clear and convincing evidence that the respondent has failed to achieve such a degree of rehabilitation so as to encourage the belief that she could resume a role as a parent for Lilyana within a reasonable period of

time; and (19) giving the respondent "a reasonable period of additional time would certainly not bring her performance as a parent to an acceptable level." The court also determined that termination of the respondent's parental rights as to Lilyana was in the best interest of the child. See General Statutes § 17a-112 (k). Accordingly, the court terminated the respondent's parental rights and appointed the petitioner the statutory parent for Lilyana. This appeal followed.[3]

I

The respondent claims that the court improperly concluded that termination of her parental rights was warranted in accordance with § 17a-112 (j) (3) (B) (i) because Lilyana previously had been adjudicated neglected and, in light of her age and needs, the respondent had failed to achieve a sufficient degree of personal rehabilitation necessary to encourage a belief that she could assume a responsible position in Lilyana's life within a reasonable period of time. The respondent argues that "[t]he trial court stressed the fact that [the respondent] did not engage in a pain clinic. The court does not acknowledge that [the respondent's] pain is now significantly reduced so that she no longer needs to attend a pain clinic and that she is cooperating with services and improving." According to the respondent, the amputation of the respondent's leg in February, 2015, "greatly ameliorated" her pain and the court's determination "is based on obsolete information." We disagree.[4]

"We begin by setting forth applicable legal principles, including our standard of review. A hearing on a termination of parental rights petition consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the court must determine whether the [petitioner] has proven, by clear and convincing evidence, a proper ground for termination of parental rights. . . . In the dispositional phase, once a ground for termination has been proven, the court must determine whether termination is in the best interest of the child. . . .

"Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. [See General Statutes § 17a-112 (j) (3) (B) (i).] That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child. . . .

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsi-

ble position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. . . . Rather, [§ 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [the parent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue. . . .

"A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Leilah W.*, 166 Conn. App. 48, 66–68, 141 A.3d 1000 (2016).

The gravamen of the respondent's claim is that the trial court improperly based its determination that she failed to rehabilitate on the fact that she failed to enroll in a pain clinic, as recommended in Dr. Rabe's 2014 report, when the amputation of her leg in 2015 so decreased her pain as to make compliance with that recommendation unnecessary. She claims that the basis for the court's conclusion that she failed to address her issues was obsolete information.

We first note that the respondent testified at trial that her level of pain had "gotten a lot better," and that she was "not in as much pain as [she] used to be." She did not testify that she no longer experienced pain or that she no longer required pain medication. In fact, she testified that her primary care physician continued to prescribe pain medication for pain management. Moreover, as previously discussed, the respondent's medical issues also include kidney infections, herniated discs, and migraine headaches. To imply that there is no risk

for her to abuse drugs, either prescription or illicit, is to ignore the other findings of the court that she has a history of substance abuse that predates her automobile accident, as well as significant mental health issues that need to be addressed.

The court, while mentioning the respondent's failure to attend the pain clinic as recommended by Dr. Rabe, also stated that Dr. Rabe testified at trial that the respondent was unlikely to improve unless she received such treatment. The court noted her limited insight and judgment as to the potential gains she could make with such treatment, and cited *In re Shane M.*, 318 Conn. 569, 589,122 A.3d 1247 (2015), for the principle that the "failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation." (Internal quotation marks omitted.) The trial court's conclusion was bolstered by the respondent's recent behavior in bringing drug paraphernalia into the courthouse on a scheduled day for trial.

On the basis of our review of the record, and construing the evidence in a manner most favorable to sustaining the judgment of the trial court, we conclude that the court properly determined that the petitioner proved by clear and convincing evidence that the respondent had failed to achieve a sufficient degree of personal rehabilitation necessary to encourage a belief that she could assume a responsible position in Lilyana's life within a reasonable period of time. Accordingly, the court did not err in terminating the respondent's parental rights.

II

The respondent's next claim is that the court violated her substantive due process rights "because [she] was recovering from a disabling medical condition[5] that had prevented her from rehabilitating as a parent." As acknowledged by the respondent's counsel during oral argument before this court, this is an "alternative" claim based on the same alleged facts as articulated in her first claim. Our review of the second claim reveals that it is simply repetitive of the respondent's first claim, with the added argument that it "should shock the conscience that the trial court would not give [the respondent] additional time to further progress so that she could care for her daughter."

The respondent cites no case law and provides no substantive detail to support her claim of a substantive due process violation under these circumstances. Further, as we concluded in part I of this opinion, the court's determination that she failed to rehabilitate was in accord with applicable case law and legal principles and, accordingly, did not "shock the conscience." Moreover, in its memorandum of decision, the court expressly stated that giving the respondent "a reason-

able period of additional time would certainly not bring her performance as a parent to an acceptable level.'' The respondent's second claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

\*\* December 9, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In the same proceeding, the court also terminated the parental rights of Lilyana's father, Bryan P. He did not timely appeal from that judgment. We therefore refer to Laura F. as the respondent throughout this opinion.

[2] At the termination of parental rights trial, the social worker testified that the department wanted the respondent to self-refer to show her willingness to participate in the program.

[3] We note that the attorney for the minor child filed a statement pursuant to Practice Book § 67-13 indicating that he adopts the brief submitted by the petitioner.

[4] We note that the respondent has failed to cite any portion of the transcripts to support the general conclusions as to the level of her pain, her compliance with programs, or her addressing her physical and mental health needs. On that basis alone, this court could decline to review her claim. See *In re Sena W.*, 147 Conn. App. 435, 441–42 n.5, 82 A.3d 684 (2013).

[5] We note that the respondent does not mention the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., in her argument. To the extent that she is claiming that the ADA applied to the termination of parental rights proceeding, this court previously has rejected such a claim. "[T]he ADA neither provides a defense to nor creates special obligations in a termination proceeding." *In re Antony B.*, 54 Conn. App. 463, 472, 735 A.2d 893 (1999).